N. Sidney NYHUS, Appellant,

v.

**TRAVEL MANAGEMENT CORPORATION.**

No. 23264.

United States Court of Appeals, District of Columbia Circuit.

Argued May 22, 1970.

Decided Aug. 11, 1972.

Mr. David A. Donohoe, Washington, D. C., with whom Messrs. Worth Rowley and Steven K. Yablonski, Washington, D. C., were on the brief, for appellant.

Mr. Kevin Charles, Washington, D. C., for appellee.

Before FAHY, Senior Circuit Judge, and ROBINSON and WILKEY, Circuit Judges.

SPOTTSWOOD W. ROBINSON, III, Circuit Judge:

N. Sidney Nyhus appeals from a summary judgment[1] in favor of his former employer, Travel Management Corporation (TMC), in Nyhus' suit for damages on account of TMC's allegedly wrongful refusal to issue shares of its common stock claimed by Nyhus under the terms of his employment contract. The District Court grounded its disposition on the three-year statute of limitations applicable to contract actions in the District of Columbia,[2] holding that an alleged oral agreement of the parties to defer delivery of the stock until Nyhus' demand therefor lacked a valid consideration, and so did not extend the time for suit.

■■ A party moving for summary judgment has "the burden of clearly demonstrating that there is no material issue of fact and that he is entitled to judgment as a matter of law."[3] Coactively, the other litigant "is entitled to the benefit of all favorable inferences that may reasonably be drawn from the evidence for the purpose of defeating summary judgment."[4] The court's function is limited to ascertaining whether any factual issue pertinent to the controversy exists; it does not extend to resolution of any such issue.[5] And to justify a grant of the motion, the record must show the movant's right to it "with such clarity as to leave no room for controversy,"[6] and must demonstrate that his opponent "would not be entitled to [prevail] under any discernible circumstances."[7] Encountering, as we do, substantial factual issues as to whether the alleged oral agreement of the parties was valid and whether it effectively extended the statutory period

1. Fed.R.Civ.P. 56.

2. D.C.Code § 12–301.(7) (Supp. V 1972).

3. Semaan v. Mumford, 118 U.S.App.D.C. 282, 283, 335 F.2d 704, 705 (1964). See also Fed.R.Civ.P. 56(c).

4. Semaan v. Mumford, supra note 3, 118 U.S.App.D.C. at 283 n. 2, 335 F.2d at 705 n. 2, quoting 6 Moore, Federal Practice, at 2114 (2d ed. 1953).

5. Vale v. Bonnett, 89 U.S.App.D.C. 116, 118, 191 F.2d 334, 336 (1951); Dewey v. Clark, 86 U.S.App.D.C. 137, 143, 180 F.2d 766, 772 (1950); Hunter v. Mitch-ell, 86 U.S.App.D.C. 121, 122, 180 F.2d 763, 764 (1950); Miller v. Miller, 74 App.D.C. 216, 219, 122 F.2d 209, 212 (1941).

6. Semaan v. Mumford, supra note 3, 118 U.S.App.D.C. at 283 n. 2, 335 F.2d at 705 n. 2, quoting Traylor v. Black, Sivalls & Bryson, Inc., 189 F.2d 213, 216 (8th Cir. 1951).

7. Semaan v. Mumford, supra note 3, 118 U.S.App.D.C. at 283 n. 2, 335 F.2d at 705 n. 2, quoting Traylor v. Black, Sivalls & Bryson, Inc., supra note 6, 189 F.2d at 216.

sufficiently to render Nyhus' suit timely, we reverse and remand for further proceedings.

## I

In aspects which are critical to any trial on the merits, the facts are seriously in dispute.[8] On review of the propriety of the summary judgment awarded to TMC, however, we must read the record—and in this opinion we portray it[9]—in the light most favorable to Nyhus.[10] So viewed the backdrop against which we consider the legal problems presented becomes relatively simple although the problems themselves remain considerably less so.

■ In 1962, the parties entered into a written unsealed contract providing for Nyhus' employment by TMC in an executive capacity and stipulating the terms and duration of the employment.[11] The contract set forth a formula by which Nyhus' salary was to be computed, and conferred options as to its payment in cash or in common stock of the employer. By mutual consent, the employment relation was terminated on May 31, 1964, at which time Nyhus was entitled to a block of TMC stock[12] as a part of his compensation for the previous six-month period.

Shortly prior to close of the employment, Nyhus discussed his stock entitlement with Edward Kingman, TMC's treasurer.[13] Nyhus expressed the fear that income taxes on the stock, as he conceived them, would impose a financial strain beyond his then present means.[14] He proposed that, instead of issuing certificates for the stock at that time, a notation of TMC's obligation be made on the corporate books, and that delivery of the stock await Nyhus' call therefor at such future time as he might become financially able to face the tax consequences. Kingman, characterizing the proposal as a "common sense approach," agreed and stated that he would take the steps necessary to effectuate it.[15] This

8. See notes 12, 15, *infra.*

9. We realize, of course, that the facts may shape up differently upon a trial on the merits.

10. Overseas Media Corp. v. McNamara, 128 U.S.App.D.C. 48, 50 n. 3, 385 F.2d 308, 310 n. 3 (1967); Murray v. Lichtman, 119 U.S.App.D.C. 250, 252, 339 F.2d 749, 751 (1964); Libby v. L. J. Corp., 101 U.S.App.D.C. 87, 90, 347 F.2d 78, 81 (1957); Snyder v. Hillegeist, 100 U.S.App.D.C. 368, 370, 246 F.2d 649, 651 (1957).

11. The record does not disclose where the employment contract was made or where it was to be performed. The law of the District of Columbia—the forum—thus governs the determination as to whether the action was barred by the statute of limitations, as well as all other determinations respecting application of the statute. Filson v. Fountain, 90 U.S.App.D.C. 273, 274, 197 F.2d 383, 384 (1952); Kaplan v. Manhattan Life Ins. Co., 71 App.D.C. 250, 252–253, 109 F.2d 463, 465–466 (1940); Wells v. Alropa Corp., 65 App.D.C. 281, 282, 82 F.2d 887, 888 (1936); Restatement (Second) of Conflict of Laws § 142 (1971). As will be seen, past decisions in this jurisdiction fashion the principles which are dispositive of the issues presented.

12. TMC denied any obligation to issue the stock to Nyhus. It charged that Nyhus did not devote full time to his duties and that he was unable to perform as its chief executive. It also disclaimed any knowledge of Nyhus' election to take stock as part of his salary.

13. The discussion, according to Nyhus, took place in May, 1964. He was unable to pinpoint the exact date.

14. The stock was not registered under the Securities Act of 1933, 15 U.S.C. § 77a et seq. (1970). The employment contract provided that certificates for shares issued to Nyhus must bear a restrictive legend forbidding sale unless Nyhus furnished an opinion of counsel satisfactory to TMC that the stock could legally be sold without prior registration. Nyhus voiced the opinion that unregistered restricted stock was unmarketable, and the feeling that he could not then stand the drain on his financial resources that the income taxes he expected on the acquisition would entail.

15. TMC seemingly denies that any such discussion took place. It asserts that even if it did Kingman's response to Nyhus' deferral request was "unauthorized, illegal and unenforceable."

arrangement was never reduced to writing.

On January 15, 1968, Nyhus made his first request for issuance of certificates for the stock. Similar demands were made on several occasions thereafter and TMC refused them all. Nyhus brought his action in the District Court on January 30, 1969. In its answer to the complaint, TMC coupled a general denial with a plea of the statute of limitations,[16] and later moved for summary judgment solely on the ground that the suit was barred by the statute.

The District Court sustained that defense and indicated from the bench its reasons. There was no bailment of the stock, the court said, for "[t]here was no delivery. There was no property involved." Rather, by the court's assessment, "[t]he suit in question is simply a suit on a contract and the statute has run on the contract." The court explicated "that the so-called accommodation was not a new contract. There was no consideration for that, unless it be a mutual agreement to assist the plaintiff to avoid his tax obligations, and that is illegal consideration and such a contract would be unenforceable." TMC's motion for summary judgment was accordingly granted, and the case was dismissed.

## II

We agree unreservedly with the District Court that no bailment of the stock in question ever arose. A *sine qua non* of bailment is possession by one of the personal property of another;[17] the first essential is a subject matter *in esse*.[18] The record here negates any notion that TMC at any time held stock—as existing property—for Nyhus. An affidavit submitted by TMC in support of its motion for summary judgment declares that no certificate for the stock which Nyhus claims was ever issued. Not only has Nyhus not controverted that declaration, but his theory throughout this litigation has been that TMC was under a duty as a contractor, rather than as a bailee, to deliver the stock on demand. Like the District Court, we accept the relationship of the parties as one purely of contract.

In the District of Columbia, suit on a contract not under seal must ordinarily be commenced within three years from the time the cause of action accrues.[19] The stock to which Nyhus laid claim represented a portion of the compensation he earned during the six-month period ending May 31, 1964. On the latter date, Nyhus' right to the stock vested under the terms of his employment contract. He did not institute suit for alleged breach of TMC's obligation to deliver the stock until January 30, 1969. It is evident that if nothing more appeared, the action was time-barred.

By Nyhus' version, however, there was considerably more. He says that in May, 1964, he informed TMC of his inability to absorb income taxes on the

16. See Fed.R.Civ.P. 8(c).

17. Earhart v. Callan, 221 F.2d 160, 163 (9th Cir.), cert. denied, 350 U.S. 829, 76 S.Ct. 59, 100 L.Ed. 740 (1955); Iron City Sand & Gravel Div. of McDonough Co. v. West Fork Towing Corp., 298 F.Supp. 1091, 1095 (N.D. W.Va.1969), rev'd on other grounds, 440 F.2d 958 (1971); Smalich v. Westfall, 440 Pa. 409, 269 A.2d 476, 480 (1970); Crandall v. Woodard, 206 Va. 321, 143 S.E.2d 923, 927 (1965).

18. General Ref. Co. v. International Harvester Co., 173 Md. 404, 196 A. 131, 136 (1938); Crandall v. Woodard, *supra* note 17, 143 S.E.2d at 928; Barnes v. Patrick, 176 Wash. 142, 28 P.2d 293, 296,

91 A.L.R. 901 (1934). See also New York Life Ins. Co. v. Mason, 151 Ark. 135, 235 S.W. 422, 424, 19 A.L.R. 618 (1921). We do not say that a contract envisioning a bailment of nonexistent property could not generate such a bailment in the event that the property later came into existence. See Collins' Appeal, 107 Pa. 590, 52 Am.Rep. 479 (1883). But, as hereafter stated in text, TMC never issued the stock for which Nyhus contends.

19. D.C.Code § 12–301(7) (Supp. V 1972). There is an exception, D.C.Code § 12–301 (1967), for contracts for the sale of personal property. D.C.Code § 28:2–725 (1967).

stock, and requested that delivery be put off until his financial pressures sufficiently eased. He says further that TMC orally concurred in the proposal, and that that concurrence amounted to an agreement to delay delivery pending his future call. Nyhus first demanded the stock on January 15, 1968, and, following TMC's refusal to issue it, instituted his action slightly more than a year later. Arguing that the statute began to run only when he asked for the stock, he urges us to hold that his suit was well within the statutory three-year period.

By our analysis, Nyhus confronts four problems. The initial question, which the District Court answered in the negative, is whether the agreement to defer issuance of the stock was accompanied by such consideration as would enable it to serve as a basis for postponing the running of the statute. The postponement which Nyhus requested and to which TMC acceded was an arrangement with a view to putting off Nyhus' income tax liability—through deferral of delivery—to a future tax period, thus developing the further question whether it was illegal. The agreement between Nyhus and TMC was oral, and an additional question is whether an unwritten understanding to suspend the time of performance of a contract can effect the running of the statute. Lastly, the understanding was at most to delay issuance of the stock until Nyhus called for it, and the final question is whether a demand was necessary to activate the

statute. To a consideration of these questions, in the order mentioned, we now proceed.

## III

█ The power to contract is also the power to modify the effect of prior agreements by mutual consent.[20] We have no doubt as to the parties' prerogative and ability to contract to alter their rights under an existing agreement and ingraft new terms upon it.[21] Acting concurrently, they are as free to change their contract after making it as they were to make it in the first instance.[22] Nyhus invokes his employment contract as the basis for his contention that TMC owed him stock as a part of the compensation he had earned. Nyhus says that the deferral arrangement to which TMC agreed changed the time for performance of that obligation to the point at which he demanded delivery. It is evident that if this theory is correct, Nyhus' action was instituted in the District Court in time.

█ To this approach TMC registers the initial objection that its alleged undertaking to postpone delivery of the stock lacked any consideration whatsoever and, as previously stated, the District Court so held. We do not doubt that a prior contract is effectively modified by a new agreement only if the latter possesses all of the essential elements of a valid contract.[23] Like any other contract, the modifying agreement must be

---

20. Florey v. Meeker, 194 Or. 257, 240 P.2d 1177, 1188 (1952). See also American Fruit Product Co. v. Davenport V & P Works, 172 Iowa 683, 154 N.W. 1031, 1035 (1915); Friday v. Regent Improvement Co., 330 Pa. 481, 199 A. 914, 916 (1938).

21. Hawkins v. United States, 96 U.S. 689, 697–698, 24 L.Ed. 607 (1877); Frommeyer v. L. & R. Const. Co., 261 F.2d 879, 881–882, 69 A.L.R.2d 1040 (3d Cir. 1958) (applying New Jersey law); Linz v. Schuck, 106 Md. 220, 67 A. 286, 290 (1907); Morecraft v. Allen, 78 N.J.L. 729, 75 A. 920, 921 (1910).

22. Zumwinkel v. Leggett, 345 S.W.2d 89, 94 (Mo.1961); Headley v. Cavileer, 82 N.J.L. 635, 82 A. 908, 910 (1912); Webb v. Moran, 186 Okl. 140, 96 P.2d 308, 311 (1939); Dillman v. Massey Ferguson, Inc., 13 Utah 2d 142, 369 P.2d 296, 298 (1962).

23. Main Street & Agricultural P.R. Co. v. Los Angeles Traction Co., 129 Cal. 301, 61 P. 937, 938 (1900); Zumwinkel v. Leggett, supra note 22, 345 S.W.2d at 94; Tsesmelis v. Sinton State Bank, 53 S.W.2d 461, 462, 85 A.L.R. 319 (Tex. Com.App.1932).

supported by a consideration,[24] and that is no less so where the office of the agreement is to extend the time for performance.[25]

■ Ordinarily, the agreement of contracting parties to extend the time for the contract's performance finds its consideration in the mutual promises of the parties.[26] Normally there is, on the one side forbearance of the right to insist upon performance until arrival of the new date and, on the other, benefit derived from postponing performance, and the promise on each side is consideration for the promise on the other.[27] It may well be that this case was appropriate for application of that principle. By the mutual agreement to postpone delivery, Nyhus yielded, for the time being, his right to call for the stock, and TMC gained some respite in performance of its obligation to issue it. There may have been, on the one side of the transaction, enough forbearance in action which Nyhus was otherwise privileged to take and, on the other, sufficient benefit accruing to TMC therefrom, to render the deferral arrangement legally binding. Without hearing evidence, it cannot be said that the deferral was not a boon of some potential value to TMC as well as to Nyhus.[28] We are thus unable to conclude that as a matter of law the parties' bilateral agreement[29] to postpone was or was not supported by consideration in the orthodox sense.[30]

We are mindful that the postponement was at Nyhus' request and was for an undefined period, but that, in our view, would not necessarily render the consideration as to TMC illusory. We realize that a creditor who promises to forbear for only so long as forbearance serves his whim gives up nothing of value to the debtor,[31] but the situation before us, viewed realistically, may not be conducive to that sort of characterization. The occasion for the deferral agreement was Nyhus' inability to pay income tax-

24. Main Street & Agricultural P.R. Co. v. Los Angeles Traction Co., *supra* note 23, 61 P. at 938–939; Thompson v. Sweet, 91 Colo. 552, 17 P.2d 308, 310 (1932); Davis & Co. v. Morgan, 117 Ga. 504, 43 S.E. 732, 733 (1903); Parkhurst v. Investors Syndicate, 138 Kan. 7, 23 P.2d 589, 591 (1933); Swanson v. Madsen, 145 Neb. 815, 18 N.W.2d 217, 219 (1945); O'Farrell v. Virginia Pub. Serv. Co., 115 W.Va. 502, 177 S.E. 304, 306 (1934).

25. In re Campbell, 105 F.2d 197, 200, 124 A.L.R. 1243 (9th Cir.), cert. denied, 308 U.S. 593, 60 S.Ct. 123, 84 L.Ed. 496 (1939); Masser v. London Operating Co., 106 Fla. 474, 145 So. 79, 83 (1932); Olmstead v. Latimer, 158 N.Y. 313, 53 N.E. 5, 6 (1899); Cummins v. Beavers, 103 Va. 230, 48 S.E. 891, 894 (1904).

26. Teal v. Bilby, 123 U.S. 572, 577, 8 S.Ct. 239, 31 L.Ed. 263 (1887); Shriner v. Craft, 166 Ala. 146, 51 So. 884, 887 (1910); Tallman v. Smith, 112 Colo. 217, 148 P.2d 581, 584 (1944); Kentucky Home Mut. Life Ins. Co. v. Leitner, 302 Ky. 789, 196 S.W.2d 421, 424 (1946); Linz v. Schuck, *supra* note 21, 67 A. at 290.

27. *E. g.*, National Time Recorder Co. v. Feypel, 93 Ill.App. 170 (1901). See also cases cited *supra* note 26.

28. We intend no intimation as to what, at a trial on the merits the evidence might demonstrate as to values accruing to TMC from the postponement.

29. Thus we distinguish cases wherein there was forbearance from the exercise of a legal right without any request to forbear or circumstances from which an agreement to forbear might be implied. *E. g.*, Spillane v. Yarmalowicz, 252 Mass. 168, 147 N.E. 571, 572, 38 A.L.R. 1401 (1925); Schroyer v. Thompson, 262 Pa. 282, 105 A. 274, 275, 2 A.L.R. 1567 (1918); Saunders v. Bank of Mecklenburg, 112 Va. 443, 71 S.E. 714, 717 (1911).

30. Danenhower v. Hayes, 35 App.D.C. 65, 66 (1919); Greene v. First Sav. & Trust Co., 36 F.2d 680, 681 (5th Cir. 1930); Cuneo Press v. Claybourn Corp., 90 F.2d 233, 236 (7th Cir. 1937) (applying Illinois law); Sanford v. Lundquist, 80 Neb. 414, 118 N.W. 129, 132 (1908); Strong v. Sheffield, 144 N.Y. 392, 39 N.E. 330, 331 (1895); Silberman v. National City Bank, 36 Ohio App. 442, 173 N.E. 16, 18 (1930); McClaugherty v. Bluefield Waterworks & Improvement Co., 67 W.Va. 285, 68 S.E. 28, 31, 32 (1910).

31. See Strong v. Sheffield, *supra* note 30, 39 N.E. at 331.

es which might be germinated by receipt of the stock. The agreement seemingly was designed to coincide delivery of the stock to dissipation of that embarrassment. Although the postponement was to such time as Nyhus might demand the stock, the record suggests that the parties may have contemplated that no call for the stock would be made until Nyhus was in position to pay taxes on it, and that his then inability to do so was more than momentary.[32] The indications of such an expectation on both sides are such as to render inappropriate a decision as to contract consideration without taking the proofs.[33]

Even if, upon a trial, the facts proved should happen not to add up to consideration, circumstances already indicated pose the prospect of an estoppel precluding TMC from backing out of the understanding to defer the stock delivery. Without doubt, Nyhus did not call for the stock for nearly four years after the arrangement for deferral was made. A rational assumption, on the basis of present knowledge, is that Nyhus relied on TMC's assent to the arrangement. On proof of that hypothesis, TMC could hardly escape liability by taking refuge in the statute of limitations.[34] We do not say that upon the evidence a trial would develop, the case would necessarily turn out that way. We do say that the record portrays enough in the direction of an estoppel to entitle Nyhus to an opportunity to prove it if he can.[35]

## IV

The District Court reasoned that the deferral arrangement modifying the stock clause of the employment contract lacked consideration "unless it be a mutual agreement to assist the plaintiff to avoid his tax obligations." That, the court concluded, would be an illegal consideration, rendering the agreement to postpone delivery of the stock unenforceable. If these premises are acceptable, it would follow that the attempted modification was ineffective, and that the statute of limitations ran on the contract clause to bar any recovery in Nyhus' suit.

TMC did not itself formally advance a claim of illegality of the deferral agreement as a defense to the action. The issue of illegality was posed, not by TMC in either its answer [36] or its motion for summary judgment, but by the court, *sua sponte,* during the hearing on the motion. Nyhus registers a complaint on that score, but we think the court acted commendably in doing so. Invalidity of a contract offensive to public policy cannot be waived by the parties;[37] it is a barrier "which the court itself [is] bound to raise in the interests of the due administration of justice." [38] Here the circumstances prompting the court's inquiry into possible illegality appeared on the face of the arrangement Nyhus relied on to steer clear of the statute of limitations, and the court very properly pursued it further.[39] Our difficulty stems not

---

32. A reading of Nyhus' deposition conveys the impression that each understood that delivery of the stock would not be requested until some indefinite date well into the future.

33. See text *supra* at notes 3–7.

34. Canada v. Allstate Ins. Co., 411 F.2d 517, 521 (5th Cir. 1969) (applying Florida law); American-Howaiian Engineering & Constr. Co. v. Butler, 165 Cal. 497, 133 P. 280, 289 (1913); Professional Ins. Corp. v. Cahill, 90 So.2d 916, 918 (Fla. 1956); Becker v. Becker, 250 Ill. 117, 95 N.E. 70, 73 (1911).

35. See text *supra* at notes 3–7.

36. Fed.R.Civ.P. 8(c).

37. Noonan v. Gilbert, 63 App.D.C. 30, 68 F.2d 775 (1934).

38. Oscanyan v. Winchester Repeating Arms Co., 103 U.S. 261, 267, 26 L.Ed. 539 (1881). See also Noonan v. Gilbert, *supra* note 37, 63 App.D.C. at 31, 68 F.2d at 776.

39. A part of Nyhus' protest is that the issue of illegality came as a surprise at the hearing on the motion for summary judgment. Nyhus did not, however, request an opportunity to make a supplemental presentation on the question prior to the court's ruling on the motion.

from the exploration made on the court's initiative, but rather from the conclusion of illegality it drew from the facts then before it.

 As the Supreme Court, speaking of federal taxes, has declared, "[t]he legal right of a taxpayer to decrease the amount of what otherwise would be his taxes, or altogether avoid them, by means which the law permits, cannot be doubted." [40] And as we ourselves have said with reference to local taxes, "[a] taxpayer is at complete liberty to decrease his taxes or avoid them altogether by means which the law tolerates. His motive to thereby reduce or eliminate taxation does not generate liability if without it the transaction does not do so." [41] Thus bona fide transactions are not to be condemned merely because they convert taxable property into nontaxable forms,[42] or effect transfer to another,[43] or involve an interchange between individual and coroprate ownership.[44] We think a transaction does not necessarily become illegal simply because it postpones the receipt of income to a future tax period, when taxes thereon will be paid in full.

Income earned in a given taxable year must generally be reported for that year, but tax laws frequently indulge exceptions permitting deferral until some event which may occur in some future tax period.[45] There are, indeed, federal provisions which under certain conditions specifically empower employees receiving employer-stock as compensation to postpone return of the stock as income.[46] It is wholly conceivable that the restricted stock [47] claimed by Nyhus was not reportable as income for the periods in which the services it represented were actually rendered.[48] We need not investigate that possibility, however, for we conclude that in any event a determination that the parties' agreement was illegal is inadequately supported by the information before the District Court when its ruling on the motion for summary judgment was made.

 All the District Court then knew, and we know now, is that the parties agreed to put off delivery of the stock until Nyhus became able to pay the taxes he thought would fall due when he received the stock. But, as we have indicated, "even though the transaction is a device to avoid the burden of taxation, or to lessen that burden, it is

**40.** Knetsch v. United States, 364 U.S. 361, 365, 81 S.Ct. 132, 5 L.Ed.2d 128 (1960), quoting Gregory v. Helvering, 293 U.S. 465, 469, 55 S.Ct. 266, 79 L.Ed. 596 (1935). See also Atlantic Coast Line R.R. v. Phillips, 332 U.S. 168, 172–173, 67 S.Ct. 1584, 91 L.Ed. 1977 (1947); Superior Oil Co. v. Mississippi ex rel. Knox, 280 U.S. 390, 395–396, 50 S.Ct. 169, 74 L.Ed. 504 (1930); United States v. Isham, 84 U.S. (17 Wall.) 496, 506, 21 L.Ed. 728 (1873); Jones v. Helvering, 63 App.D.C. 204, 207, 71 F.2d 214, 217, cert. denied, 293 U.S. 583, 55 S.Ct. 97, 79 L.Ed. 679 (1934).

**41.** District of Columbia v. Neyman, 135 U.S.App.D.C. 193, 196, 417 F.2d 1140, 1143 (1969).

**42.** State ex rel. St. Louis Union Trust Co. v. Hoehn, 351 Mo. 382, 173 S.W.2d 393, 395 (1943); Republic Ins. Co. v. Highland Park Independent School Dist., 129 Tex. 55, 102 S.W.2d 184, 187–188 (1937).

**43.** Martin Co. v. State Tax Comm'n, 225 Md. 404, 171 A.2d 479, 486–487 (1961); Great Oak Bldg. & Loan Ass'n v. Rosenheim, 341 Pa. 132, 19 A.2d 95, 97 (1941).

**44.** Fuller v. Bassett's Estate, 246 Mich. 440, 224 N.W. 639, 641 (1929); Shelley v. Creighton, 140 N.J.Eq. 603, 55 A.2d 646, 649 (1947).

**45.** E. g., Int. Rev. Code of 1954 §§ 404, 421, as amended, 26 U.S.C. §§ 404, 421–425 (1970).

**46.** For a comparison of pre- and post-June 30, 1969 restrictive stock options, see Int. Rev. Code of 1954 § 421, as amended, 26 U.S.C. §§ 421–425 (1970), and Treas. Reg. § 1.421–5 (1957), amended by T.D. 6416 (1959), T.D. 6527 (1961); Treas. Reg. §§ 422.1–.2 (1966); Treas.Reg. § 1.423.1–.2 (1966); Treas.Reg. §§ 1.-424.1–.2 (1966).

**47.** See note 14, supra.

**48.** See note 52, infra. See also Treas.Reg. § 1.421–6(d)(2) (1959).

not for that reason alone illegal." [49] The "purpose of [a transaction] to minimize or avoid taxation is not [itself] an illicit motive;" [50] on the contrary, "before a court can declare a contract to be a collusive subterfuge, there must be evidence to sustain that finding, or its equivalent." [51] In our view, similar conditions must be met prior to invalidation of the parties' agreement to defer deliv-

ery of the stock until demanded by Nyhus as an illegal bargain rendering it unenforceable in court.[52]

Beyond that, as is well known, preparation of an income tax return can be a complicated undertaking, the difficulties of which are intensified by the availability of alternative treatments for individual items of gross income, expenses and deductions.[53] Nyhus' effort to delay re-

49. Iowa Bridge Co. v. Commissioner, 39 F.2d 777, 781 (8th Cir. 1930).

50. Granite Trust Co. v. United States, 238 F.2d 670, 675 (1st Cir. 1956).

51. Consolidated Apparel Co. v. Commissioner, 207 F.2d 580, 583 (7th Cir. 1953).

52. The known facts of the case at bar are particularly close to those presented in Rev.Rul. 68–87 1968–1 Cum.Bull. 184 to which no hint of illegality attached:

Advice has been requested as to the time income is realized, and as to the amount of income realized, for Federal income tax purposes, by an employee under the circumstances described below.

An agreement between a corporation and an employee provides that the employee is to receive as compensation a base salary plus an annual bonus established by the board of directors of the corporation. The employee has the right to elect, prior to January 1 of each year, to have all or part of any bonus which may be awarded to him for that year paid to him in restricted stock of the corporation. The election for that year can be neither modified nor revoked thereafter.

The certificates of restricted stock paid to the employee pursuant to his election are stamped with a legend stating that the shares represented by such certificates shall not be sold, assigned, transferred, discounted, or pledged as collateral for a loan, without the prior written consent of the salary committee of the board of directors. Those restrictions continue in effect during the employee's employment with the corporation, and lapse a specific number of years after the effective date of termination of such employment for whatever cause. However, the corporation's salary committee will approve a release from the restrictions in the case of hardship which in the sole judgment of the committee justifies such action.

The foregoing restrictions, as evidenced by the legend stamped on the

certificates of stock, have a significant effect on the value of the stock. Thus, under section 1.61–2(d)(5) of the Income Tax Regulations, the time and amount of compensation paid the employee in the form of such stock are determined by application of the rules prescribed by section 1.421–6(d)(2) of the regulations. Under the provisions of that section of the regulations, compensation is realized when the restrictions on the stock lapse, or when the stock is sold or exchanged in an arm's length transaction, whichever occurs earlier. The amount of such compensation is the lesser of (1) the fair market value of the stock (determined without regard to the restrictions) at the time of its acquisition, or (2) either the fair market value of the stock at the time the restrictions lapse, or the consideration received upon the sale or exchange, whichever is applicable.

Accordingly, the election by the employee in the instant case, prior to January 1 of a given year, to have all or part of any bonus awarded him for that year paid to him in stock of his employer corporation that is subject to restrictions which have a significant effect on its value, will result in the realization of compensation by the employee at the time the restrictions on the stock lapse, or the stock is sold in an arm's length transaction, whichever event occurs earlier.

53. Generally, payments representing compensation for services rendered are income to a taxpayer on the cash basis in the year in which actually or constructively received. See Treas.Reg. § 1.451–1 (1957), as amended T.D. 7001 (1969), T.D. 7154 (1971). The period in which items of gross income are to be included is the taxable year of receipt unless under the method of accounting used in computing taxable income the amount should be included in another year. See Int. Rev.Code of 1954 § 451(a), 26 U.S.C. § 451(a) (1970). See also Int.Rev.Code

ceipt of part of his compensation presently appears to harmonize with a practice fairly common among some groups of taxpayers who regularly contract for payment of major portions of their income in future years when ·their earnings will be leaner and so their tax obligations less.[54] Those whose agreements are illicitly designed to cheat the tax laws deserve the punishment the law prescribes, and the agreements themselves call for condemnation at the hands of the courts.[55] But we can hardly expect lay taxpayers [56] to unfailingly reach the right answers on interpretations of tax laws and regulations that oft-times confound tax officials and members of the legal profession alike.[57]

As the Supreme Court has admonished, "[t]he principle that contracts in contravention of public policy are not enforceable should be applied with caution and only in cases plainly within the reasons on which that doctrine rests." [58] Although the deferral of delivery of the stock to which Nyhus and TMC agreed may be disallowed by tax authorities as impermissible, we hold that on the showing of record as presently made those reasons do not obtain to produce illegality of the agreement without more.

V

TMC also contends that the oral character of the agreement for deferral of delivery of the stock left the statute of limitations to its accustomed operation. In an effort to buttress its point, TMC invokes a provision of the District of Columbia Statute of Frauds reading:

> In an action upon a simple contract, an acknowledgement or promise by words only is not sufficient evidence of a new or continuing contract whereby to take the statute out of the operation of the statute of limitations or to deprive a party of the benefit thereof unless the acknowledgement or promise is in writing, signed by the party chargeable thereby.[59]

This contention does not bear scrutiny. The statute upon which TMC relies is similar to others commonly found in

of 1939 ch. 1 § 42, 53 Stat. 4, 24. To trigger the need to include income, its receipt is essential only in the case of cash-basis taxpayers. The time when the income was earned may be irrelevant, and receipt may be constructive as well as actual. Treas.Reg. § 1.451–2 (1957).

54. *E. g.*, Robinson v. Commissioner, 44 T.C. 20 (1965).

55. For a general discussion of the question of fraudulent activities involving taxes and the federal laws prohibiting such efforts, see Sansone v. United States, 380 U.S. 343, 347–349, 85 S.Ct. 1004, 13 L.Ed.2d 882 (1965).

56. Both Nyhus and Kingman, TMC representative with whom the deferral arrangement was made, are accountants, but the record is silent as to the experience either may have had in the taxation field.

57. See note 52, *supra.*

58. Twin City Pipe Line Co. v. Harding Glass Co., 283 U.S. 353, 356–357, 51 S. Ct. 476, 477, 75 L.Ed. 1112 (1931). See also Landa v. Astin, 90 U.S.App.D.C. 86, 88, 193 F.2d 369, 371 (1951); Godfrey v. Roessle, 5 App.D.C. 299, 304 (1895).

59. "In an action upon a simple contract, an acknowledgement or promise by words only is not sufficient evidence of a new or continuing contract whereby to take the case out of the operation of the statute of limitations or to deprive a party of the benefit thereof unless the acknowledgement or promise is in writing, signed by the party chargeable thereby. This section does not alter or take away, or lessen the effect of a payment of principal or interest made by any person. In actions against two or more joint contractors, or executors, or administrators, if it appears at the trial, or otherwise, that the plaintiff, though barred by the statute of limitations as to one or more of the defendants, is nevertheless entitled to recover against any other defendant by virtue of a new acknowledgement or promise or otherwise, judgment may be given for the plaintiff as to that defendant. An indorsement or memorandum of a payment written or made upon a promissory note, bill of exchange, or other writing, by or on behalf of the party to whom the payment is to be made, is sufficient proof of the payment so as to take the case out of the operation of the statute of limitations." D.C.Code § 28–3504 (1967).

American jurisdictions.[60] Their purpose is to affect situations different from that presented here. A conventional statute of limitations operates upon remedies and not substantive rights;[61] its running extinguishes, not the obligor's obligation, but rather the obligee's power to enforce it.[62] From this premise the courts have long held that the period of limitation is interrupted by a new promise to dissolve a debt, or by an unqualified acknowledgement of a debt from which such a promise might fairly be implied;[63] and since the unextinguished original debt remained *in foro conscientiae* as obligatory, it was itself a sufficient consideration for the new promise.[64] This doctrine, in the eyes of many, has been too much of an invitation to fraud and vexing litigation. A new unilateral promise or acknowledgement is easy to charge and difficult to disprove, and the stream of controversies over the making of oral promises and acknowledgements is potentially endless. Legislatures, including Congress, have thus to curb those consequences by imposing the requirement of a writing signed by the debtor.

▪ That the situation at bar falls outside the intendment of the statute upon which TMC relies can hardly be doubted. Nyhus' action rested neither upon a new promise to honor the clause of the employment contract as it was written nor upon an acknowledgement of responsibility to do so. The theory of the action was a new bilateral agreement, supported by a new consideration, as to the time of performance of the obligation imposed by that clause.[65] Most of the courts have held that statutes of the type under discussion do not apply to an arrangement having for its consideration, not simply the moral obligation to honor the old debt, but a fresh contemporaneous consideration which would support a binding contract between the parties.[66] We are bound by precedent to reach the same conclusion here.

In Cafritz v. Koslow,[67] the plaintiff alleged a loan to the defendant during the period from 1924 to 1930, and a subsequent loan between January 1, 1942, and October 30, 1942, in exchange for the defendant's promise to repay the old indebtedness. The District Court dismissed the complaint, filed February 5, 1945, on the defendant's plea that the statute of limitations barred recovery. This court held that action to be erroneous. We agreed with the District Court that the "statute has reference only to a unilateral act or statement and does not render ineffective a new promise supported by contemporaneous consideration." [68] We disagreed with the District Court, however, in its holding "[t]hat there was no new contract or agreement, supported by consideration, which would revive the old indebtedness and remove the bar of the statute of limitations." [69] We said:

> As we view the posture of this case, appellant was seeking recovery on the basis of a new relationship founded

60. See Annot., 135 A.L.R. 433, 434 (1941).

61. Cafritz v. Koslow, 83 U.S.App.D.C. 212, 214, 167 F.2d 749, 751 (1948); Talbott v. Hill, 49 App.D.C. 96, 98, 261 F. 244, 246 (1919).

62. See cases cited *supra* note 61.

63. *E. g.*, Moore v. Snider, 71 App.D.C. 293, 294, 109 F.2d 840, 841, cert. denied, 309 U.S. 685, 60 S.Ct. 808, 84 L.Ed. 1029 (1940); Hayden v. International Banking Corp., 59 App.D.C. 313, 315, 41 F.2d 107, 109 (1930); Bean v. Wheatley, 13 App.D.C. 473, 480–481 (1898); Ruppert v. Beavans, 2 App.D.C. 298, 301–302 (1894).

64. Shepherd v. Thompson, 122 U.S. 231, 235 (1887); Campbell v. Holt, 115 U.S. 620, 624–625, 6 S.Ct. 209, 29 L.Ed. 483 (1885); Cafritz v. Koslow, *supra* note 61, 83 U.S.App.D.C. at 214, 167 F.2d at 751; Restatement of Contracts § 86 (1932).

65. See Part III, *supra*.

66. See cases collected in Annot., 135 A.L.R. 433, 434–37 (1941).

67. *Supra* note 61.

68. 83 U.S.App.D.C. at 214, 167 F.2d at 751 (footnote omitted).

69. *Id.*, at 213, 214, 167 F.2d at 750, 751.

upon an oral contract whereby the old indebtedness was incorporated as an element of consideration. Therefore it is immaterial to question whether the old indebtedness was revived, for if it ever existed and remained unsatisfied it was yet subsisting at the time the parties made their new contract. The statute of limitations operates to extinguish the remedy, by withdrawing from the creditor the privilege of using the courts to enforce the contract, but it does not extinguish his right. . . . It is the new relationship, and not the old debt, that now serves to measure the creditor's right.[70]

*Cafritz* charts the decisional course to be pursued here. Nyhus charges a bilateral agreement, supported by a contemporaneous consideration,[71] postponing into the indefinite future the time for performance of the contract provisions respecting delivery of the stock in issue. His suit seeks relief for TMC's nonperformance of the stock delivery contract as so modified. The modifying agreement, though oral, fell outside the purview of the statute which TMC invokes.[72] If, then, that agreement postponed the running of the statute of limitations until Nyhus made actual demand for the stock, it follows that his action in the District Court was commenced in time.

## VI

■ Where a demand is necessary to perfect a cause of action, the statute of limitations does not commence to run until the demand is made.[73] This rule has found consistent application in noncontract cases.[74] To be sure, a party is not at liberty to stave off operation of the statute inordinately by failing to

70. *Id.* at 214, 167 F.2d at 751.

71. See Part III, *supra.*

72. It may well be doubted whether in any event the statute totally barred Nyhus from relief. The record contains a letter from an official of TMC to an official of a nonparty corporation reading in part as follows:

> As you know, Nyhus only accepted the cash portion of his salary for the period 12/1/63–5/31/64 as he didn't want to pay the tax on the stock portion. Arthur Andersen asked him to sign a waiver of rights to the stock, but at that time, he said he wanted it eventually. Therefore, AA & Co. accrued it as of 11/30/64 in the amount of $6,250.00. Under this contract, this would amount to 2,148 shares valued at $2.91 a share. However, as such stock was not paid within two and one half months after our fiscal year-end TMC would be denied a tax deduction for the $6,250.00 in 1964 and could not carry it forward as an offset against income in future years. As a result, when we issue the stock, I think we would be justified in deducting 48% of 6,250 or $3,000.00. Forty-eight per cent will be the corporate tax rate in effect in 1965 and after.

While the record does not disclose the purpose of or occasion for this letter, it conceivably could satisfy the statutory requirement of a writing. Compare Strong v. Andros, 34 App.D.C. 278, 281–282, 19 Ann.Cas. 101 (1910). See also Moore v. Snider, *supra* note 63, 71 App. D.C. at 294, 109 F.2d at 841. If, however, an award of damages were predicated solely on the letter as the satisfaction of the statute, it may be that Nyhus would not get all he asked for since the letter, and not the original obligation, might be the measure of recovery. See Hayden v. International Banking Corp., *supra* note 63, 59 App.D.C. at 315–316, 41 F.2d at 109–110.

73. *E. g.*, Taylor v. Benham, 46 U.S. (5 How.) 233, 276, 12 L.Ed. 130 (1847) (applying Alabama law) ; Stice v. Peterson, 144 Colo. 219, 355 P.2d 948, 953 (1960) ; Emerson v. North American Transp. & Trading Co., 303 Ill. 282, 135 N.E. 497, 499, 23 A.L.R. 1 (1922) ; Lang v. Straus, 107 Ind. 94, 6 N.E. 123, 126, rehearing, 7 N.E. 763, 766 (1886) ; Williams v. Williams, 112 Me. 21, 90 A. 500, 501 (1914) ; Bannitz v. Hardware Mut. Gas. Co., 219 Minn. 235, 17 N.W.2d 372, 373, 159 A.L.R. 1017 (1945) ; Cook v. Carpenter, 212 Pa. 165, 61 A. 799, 801 (1905) ; Ott v. Boring, 131 Wis. 472, 110 N.W. 824, 828 (1907).

74. Irvine v. Gradoville, 95 U.S.App.D.C. 263, 265, 221 F.2d 544, 546 (1955) ; Schupp v. Taendler, 81 U.S.App.D.C. 59, 60, 154 F.2d 849, 850 (1946). See also cases collected in Annot., 57 A.L.R. 1044 (1958).

make demand;[75] when statutorily unstipulated, the time for demand is ordinarily a reasonable time.[76] That, however, is a matter of the parties' expectations, and a different result follows when an indefinite delay in making demand was within their contemplation.[77]

Where, on the other hand, a call for performance is not an essential element of the cause of action, the running of the statute does not await a demand.[78] Thus, upon a loan of money unaccompanied by any agreement as to when it is to be repaid, the debt matures at once and the statute begins to run immediately.[79] Likewise, as we have held consistently with the overwhelming weight of authority,[80] the limitation period on a demand note dates, as to the maker of the note, from the date of the instrument.[81] We have concluded similarly with respect to other agreements to repay money on demand.[82] "In general," we have said, "one agrees to pay 'on demand' obligations that are presently due, not those which are to become due in the future."[83] Standing alone, the words "on demand" do not import a condition precedent to a right of action on the instrument, but merely describe a debt that is due when made.[84]

It cannot be gainsaid, however, that the parties may, if they desire, agree that a demand shall be prerequisite to maintenance of any suit on the contract. Notwithstanding some doctrinal aberrations, the cases recognize abundantly that where the contract envisions an actual demand, the statute of limitations is set in motion only by such a demand.[85] That principle also finds solid support in our own decisions. In Kenyon v. Youngman,[86] this court held that "a promissory note payable on demand is a present debt, payable without any demand, and the statute begins to run from its date,"[87] but the court also admonished that "this rule does not apply where a different intention of the parties is apparent from the terms of the instrument."[88] Later, in Schupp v. Taendler,[89] the court held that "money, being delivered as a loan payable on demand, became due at once and the stat-

75. See cases collected in Annots., 23 A.L.R. 7, 10–11 (1923), 47 A.L.R. 178, 181–83 (1927), 128 A.L.R. 157, 158 (1940).

76. See cases collected in Annot., 57 A.L.R. 2d 1044, 1052–56 (1958).

77. West v. American Tel. & Tel. Co., 311 U.S. 223, 239, 61 S.Ct. 179, 85 L.Ed. 139 (1940) (applying Ohio law) ; Smith v. Early, 60 Ga.App. 506, 3 S.E.2d 913, 914–915 (1939) ; Fallon v. Fallon, 110 Minn. 213, 124 N.W. 994, 996, 32 L.R.A., N.S., 486, 136 Am.St.Rep. 464 (1910). See text *infra* at notes 85–95 and authorities cited.

78. *E. g.*, Sturdivant v. McCorley, 83 Ark. 278, 103 S.W. 732, 733, 11 L.R.A.,N.S., 825 (1907). See also cases cited *infra* notes 79–84.

79. *E. g.*, Teasley v. Bradley, 110 Ga. 497, 35 S.E. 782, 784, 78 Am.St.Rep. 113 (1900).

80. See cases collected in Annot., 71 A.L.R. 2d 284 (1960). Illustrative of the principle stated in text *supra* at note 73, the statute starts running against a simple indorser of a demand note only upon actual demand since no cause of action accrues against him until such a demand is made. See cases collected in Annot., 71 A.L.R.2d 284, 306–09 (1960).

81. Kenyon v. Youngman, 59 App.D.C. 300, 301, 40 F.2d 812, 813 (1930).

82. Schupp v. Taendler, *supra* note 74, 81 U.S.App.D.C. at 60, 154 F.2d at 850; Feucht v. Keller, 70 App.D.C. 117, 119, 104 F.2d 250, 252 (1939).

83. Feucht v. Keller, *supra* note 82, 70 App.D.C. at 119, 104 F.2d at 252.

84. See Dominion Trust Co. v. Hildner, 243 Pa. 253, 90 A. 69 (1914). See also Gregg v. Middle States Utils. Co., 228 Iowa 933, 293 N.W. 66, 72–73, 132 A.L.R. 415 (1940) ; Whitehurst v. Duffy, 181 Va. 637, 26 S.E.2d 101, 105 (1943).

85. See cases collected in Annots., 159 A.L.R. 1021 (1945), 71 A.L.R.2d 284, 309–19 (1960).

86. *Supra* note 81.

87. 59 App.D.C. at 301, 40 F.2d at 813, quoting, Hitchings v. Edmands, 132 Mass. 338 (1882).

88. *Id.*

89. *Supra* note 74.

ute of limitations ran from the date of the loan",[90] but the court hastened to add that "[u]nquestionably, we think the parties might have so framed their contract as to make a demand prerequisite to a right of action." [91]

The significance of the observation in *Schupp* was sharpened by the citation of two supporting decisions from other jurisdictions.[92] The first was Bannitz v. Hardware Mutual Casualty Company,[93] which presented a situation quite similar to that here. Involved was a contract specifying that the balance of the plaintiff-employee's compensation under an employment contract was to be carried on the defendant-employer's books until such time as the former demanded the money or the employment terminated. The Minnesota Supreme Court allowed recovery for the plaintiff despite the fact that he did not make demand or bring suit for twelve years after termination of the employment and even though the relevant statute of limitations specified a six-year period for contract actions. Recognizing that the parties contemplated indefinite delay in making demand, the court declared that "[w]here it appears from a contract that it is the intention of the parties that the money or claim which is the subject matter thereof is to be paid upon a demand in fact, the statute of limitations does not begin to run until an actual demand for payment is made."[94] Similarly in the second cited case, Farmers & Merchants National Bank of Hooker v. Cole,[95] the Oklahoma Supreme Court acknowledged that the parties could and did make actual demand a condition to liability for the repayment of a loan, and rejected a defense predicated on the statute of limitations where the action was brought within the statutory period following such a demand.

▮ We think the instant case calls for consideration in light of this principle. As we have already had occasion to delineate, the discussion between Nyhus and Kingman shortly prior to the close of Nyhus' employment with TMC if proved, was readily susceptible to the interpretation that the parties agreed that delivery of the stock was to be postponed until such indefinite time in the future as Nyhus demanded the stock when he felt able to pay income taxes on it.[96] Should a jury so find as a matter of fact, a demand was prerequisite to a right of action and the statute of limitations commenced running only from the time it was made. In that event, of course, Nyhus' action, commenced well within the statutory three-year period following demand, was not affected by the statute of limitations. We do not mean to imply that, even upon acceptance of that version by a jury, the four-year delay in making demand for the stock was necessarily reasonable.[97] But Nyhus is entitled to an opportunity to prove that it was, as well as the other essential aspects of such a theory.[98]

The judgment appealed from is reversed, and the case is remanded to the District Court for proceedings not inconsistent with this opinion.

So ordered.

---

90. 81 U.S.App.D.C. at 60, 154 F.2d at 850.

91. *Id.* The difficulty in *Schupp* was that "neither the complaint nor the statement of the case by counsel makes such a claim. So far as we are able to determine from the very unsatisfactory record in the case, no stipulation or agreement as to repayment was made, except that the loan should be paid on demand. In the circumstances, the sum loaned became due at once and the statutory period of limitations precludes the claim." *Id.*

92. *Id.*

93. *Supra* note 73.

94. 17 N.W.2d at 372.

95. 184 Okl. 337, 87 P.2d 149, 150 (1939).

96. See text *supra* at notes 13–15, 32.

97. See text *supra* at notes 75–76.

98. See text *supra* at notes 3–7.