450 A.2d 414 (1982)
In re ESTATE OF Therese Davis McCAGG.
William R. JOHNSTON, Registrar, National Museum of American Art, Smithsonian Institution, Appellant,
v.
INDUSTRIAL NATIONAL BANK, N. A., Administrator, c.t.a.d.b.n., Appellee.
No. 81-905.
District of Columbia Court of Appeals.
Argued April 21, 1982.
Decided August 12, 1982.
*415 Freddi Lipstein, Dept. of Justice, with whom J. Paul McGrath, Asst. Atty. Gen., Charles F. C. Ruff, U. S. Atty., at the time the briefs were filed, and William Kanter, Dept. of Justice, Washington, D. C., were on the briefs, for appellant.
Doris D. Blazek, Washington, D. C., for appellee.
Before NEWMAN, Chief Judge, and KELLY and FERREN, Associate Judges.
NEWMAN, Chief Judge:
This case involves a dispute over title to two paintings placed on indefinite loan to a museum by the owner, Therese Davis McCagg, in 1917. It is brought by her estate on behalf of the descendants of her residuary legatees, who acquired title to the paintings upon her death in 1932. The trial court held that the suit, filed less than two years after demand for return of the paintings was made and refused, thereby terminating the loan, was timely. We agree, and accordingly affirm the trial court's order directing the museum to return the paintings to the estate, for distribution to the owners.

I
In 1917, Therese Davis McCagg loaned two oil paintings, South American Landscape, by Frederic Church, and Mountain Scene, by Francois Diday, to the National Gallery of Art, now known as the National Museum of American Art, without charge, so that they could be enjoyed by the public. The loan agreement is evidenced only by correspondence between Mrs. McCagg and the Museum. It contains no limit on the duration of the loan, nor any indication that the loan would terminate upon Mrs. McCagg's death. Nor is there evidence of an oral agreement between the parties imposing any time limit.
Mrs. McCagg died in 1932. Her will made no specific bequest of the paintings, but contained a residuary clause giving all property not otherwise distributed to her four siblings, on whose descendants' behalf the present suit is brought. Since Mrs. McCagg's executor did not collect those assets, as he did the remainder of her estate, it is fair to infer that neither he nor the residuary legatees were aware of the existence of the paintings. The accounting of the estate was judicially approved in 1933.
The descendants of the legatees did not learn of the paintings until late 1979, when an art dealer who had inquired about the Church painting at the Museum brought it to their attention. On June 17, 1980, appellee Industrial National Bank petitioned to reopen the estate on the basis of newly discovered assets. The petition was granted and Letters of Administration were issued to appellee. On January 22, 1981, appellee, as administrator of the reopened estate, requested delivery of the paintings by telephone. The Museum refused. A formal written demand was presented to the Museum's registrar, appellant herein, on January 29, which was also refused. Less than two weeks later, on February 9, appellee sought an order to show cause why the paintings should not be delivered. The motion was granted, and a show cause hearing was held after the submission of thorough memoranda by the parties. Appellant defended on the ground that the demand for delivery of the paintings and the ensuing legal steps were untimely, and that title must therefore be deemed to have passed to the Museum. The trial court rejected this theory, and on May 28, 1981, issued an order directing appellant to deliver the paintings to the estate so that they could be distributed to their owners. The Museum now appeals that order.

*416 II
The loan of the paintings, without any limit on the time for demanding their return, constituted a bailment for an indefinite term, which neither party disputes. The law regarding the accrual of a cause of action for the return of the bailed property is longstanding and clear. The bailee is under no duty to return the property to the owner until demand is made, and thus cannot be in breach of that duty before such demand. Accordingly, a cause of action for return of the property does not arise until demand has been made and refused, or the bailee takes some action inconsistent with the bailment. Irvine v. Gradoville, 95 U.S. App.D.C. 263, 221 F.2d 544 (1955); Schupp v. Taendler, 81 U.S.App.D.C. 59, 154 F.2d 849 (1946).
At no time before 1980 did Mrs. McCagg or the Museum terminate the bailment, or take any action inconsistent with it. At Mrs. McCagg's death, the paintings were estate assets. At that time title rightfully lay in her siblings, the residuary legatees, a fact which the Museum does not dispute. Demand for delivery was not made and refused until January 1981. A cause of action for the return of the paintings to the estate, and through it to the descendants of the legatees, arose at that time and not before. The motion seeking relinquishment of the paintings was filed less than three weeks after the first refusal to deliver them, well within the applicable three year statute of limitations. D.C.Code 1981, § 12-301(2).
The Museum, however, contends that Mrs. McCagg's successors in interest were required to demand return of the paintings, or otherwise affirmatively assert their continued ownership, at some time in the past, at the risk of forfeiture to the Museum. In other words, their right to demand delivery could only be exercised for a limited time, notwithstanding the lack of any temporal limit in the loan agreement. The Museum asserts that the demand should have been made by the closing of the estate in 1933, or at least within a "reasonable time" thereafter. Accordingly, the clock would begin to run on a cause of action to recover the paintings at that time. Given that starting point, the Museum concludes that, whatever time period is used,[1] time ran out well before the reopening of the estate in 1980. At that time, according to this theory, the paintings became the property of the Museum. While the theory places a burden on the bailor to take affirmative steps in order to retain that which is hers to begin with, the bailee had no comparable responsibility to take action in order to acquire title.
The Museum raises several interrelated legal and factual arguments in support of its theory. First, appellant argues that where no time for making demand is specified, a court must define a finite "reasonable time." See Wright v. Paine, 62 Ala. 340 (1878); Slack v. Bryan, 299 Ky. 873, 184 S.W.2d 873 (1945); Southward v. Foy, 65 Nev. 694, 201 P.2d 302 (1948); Campbell v. Whoriskey, 170 Mass. 63, 48 N.E. 1070 (1898); Temirecoeff v. American Express Co., 172 Wash. 409, 20 P.2d 23 (1933).[2] If one substitutes the word "may" for "must," the principle is sound. However, one must understand its proper function and limitations, which the Museum tends to ignore. The so-called reasonable time "rule" is, or should be, merely a particular application of familiar principles of *417 implied contractual terms.[3] The basic premise is simple: the lack of an explicit provision is not necessarily dispositive as to the parties' intent. A party may show that an implied term can be inferred from explicit provisions, or from the circumstances surrounding the formation of the agreement. See Remco Business Systems v. Hollowell, D.C.App., 430 A.2d 534 (1981); 1901 Wyoming Avenue Cooperative Association v. Lee, D.C.App., 345 A.2d 456, 461-62 (1975); Svestka v. Pell, D.C.App., 224 A.2d 478 (1966). See generally 3 A. CORBIN, CONTRACTS §§ 561-62 (1960). But while an implied finite time for demand is appropriate where intended by the parties, one is not to be automatically imposed notwithstanding the apparent lack of such intent. This principle is aptly noted in Nyhus v. Travel Management Corp., 151 U.S.App.D.C. 269, 466 F.2d 440 (1972), a case relied on by the Museum.
[T]he time for demand is ordinarily a reasonable time. That, however, is a matter of the parties' expectations, and a different result follows when an indefinite delay in making demand was within their contemplation. [Id. at 282, 466 F.2d at 453 (footnotes omitted).][[4]]
In sum, we decline to adopt a rule that a limited time for making demand must be imposed regardless of the parties' intent. To put the same conclusion in a somewhat different way, an unlimited period may be reasonable, depending on the circumstances.
With this understanding in mind, there is no basis for reversal. The trial court's refusal to impose a finite reasonable time rule was correct as a matter of law. Nor can we disturb the finding that the bailment was to continue for an indefinite term. On its face, the bailment agreement neither specifies a limited time for demand, nor otherwise suggests that any was contemplated. Appellant has not contended, much less proven, that the parties understood that the paintings would be forfeited unless Mrs. McCagg or her successors made demand within some limited, albeit unspecified, period. The nature of the loaned property indicates that a loan spanning several decades would not be unreasonable, since, with appropriate storage or display, oil paintings can last for centuries. These circumstances establishing the reasonableness of a very long term loan distinguish this case from those in which a finite reasonable time standard was applied. See Wright v. Paine, supra; Slack v. Bryan, supra; Southward v. Foy, supra; Campbell v. Whoriskey, supra; Temirecoeff v. American Express Co., supra. Thus, in light of the parties' explicit agreement and the surrounding circumstances, there was adequate support for the conclusion that there was no implicit limitation on the time for reclaiming the paintings. In other words, an indefinite delay was entirely reasonable under the circumstances.
Similarly, we find no support for the conclusion that the death of the bailor triggered a duty to demand delivery. Certainly no such duty was specified in the bailment agreement, and appellant does not contend that the parties contemplated one. Nor has it cited any persuasive authority for the proposition that a constructive duty should be imposed by the court, and there appears to be none.
The Museum also argues that it was forced to undergo certain unbargained-for hardships stemming from the delay in making demand, or the failure to notify it of the owner's death. The delay allegedly forced the Museum to expend sums for the conservation of the paintings that it had *418 not undertaken to spend, and which it would have been unwilling to spendexcept on its own property. Appellant also asserts that consultation with the owner was necessary in order for the Museum to make decisions regarding matters such as cleaning, and thereby avoid potential liability for deterioration of the paintings. According to the Museum, such consultation was rendered impossible by the failure of Mrs. McCagg, her executor, and the residuary legatees to notify the Museum of the identity of the new title holders. This contention falls wide of the mark. It cannot reasonably be said that the failure to notify the Museum forced it to do anything it did not want to do. If at any time it found the benefits of holding the paintings outweighed by the costs, it could have terminated the bailment by notifying Mrs. McCagg, or, after her death, her successors. See 8 C.J.S. Bailments § 41, at 486 (1962) ("A bailment for an indefinite period ... is ordinarily terminable at will and on due notice to the other party."), and cases cited therein. Alternatively, the Museum could have sought negotiations to modify the terms of the bailment. If reasonably diligent, bona fide efforts to locate Mrs. McCagg or her successors failed, then constructive notice by publication might suffice.[5] The clock would begin to run on a cause of action for return of the paintings at that time. See Irvine v. Gradoville, supra; Schupp v. Taendler, supra. When the applicable statute of limitations had run out, title would be settled in the Museum. But the Museum never made any attempt, reasonably diligent or otherwise, to end the bailment or assert title to the paintings. To the contrary, every indication suggests that the Museum desired to retain the paintings in its possession, notwithstanding the alleged hardships it endured as a result, rather than prompt the owners to recover them. Under these circumstances, the successive owners were not required to continually reassert ownership at the peril of losing their title.
Finally, appellant invokes the discovery rule, which marks a partial departure from the general rule that the statute of limitations begins to run when the facts giving rise to a cause of action occur. See generally 52 AM.JUR.2D Limitations of Actions § 146, at 716 (1970). The doctrine provides that, "in an appropriate case, a cause of action will not accrue until the injured party discovers, or by exercise of reasonable diligence and intelligence should have discovered, facts which form the basis of a cause of action." O'Keeffe v. Snyder, 83 N.J. 478, 491, 416 A.2d 862, 869 (1980). See also Fearson v. Johns-Manville Sales Corp., 525 F.Supp. 671 (D.D.C.1981); Kunstsammlungen zu Weimar v. Elicofon, 536 F.Supp. 829, 849-52 (E.D.N.Y.1981), aff'd 678 F.2d 1150, 1164 n. 25, 1165 (2d Cir. 1982). Accordingly, where the discovery rule is applicable, it extends the period in which suit may be brought to assert a given cause of action. Its premise is obvious: it is unjust to hold a claim barred due to the passage of time when the claimant was unable to assert it at an earlier time, through no fault of his own.
The leading case applying the discovery rule in a dispute involving title to works of art is O'Keeffe v. Snyder, supra. Certain paintings owned by their creator, Georgia O'Keeffe, had been stolen from a New York art gallery. Thirty years later, she brought suit to recover them from a bona fide subsequent purchaser. If the applicable statute of limitations were held to run from the time of the theft, the claim would be barred. However, the court ruled that under the discovery rule, the statute would *419 not run until O'Keeffe knew or should have known of the accrual of her cause of action for replevin, and the identity of the possessor of the paintings. Accordingly, the case was remanded to determine whether, and if so, when, reasonable diligence would have resulted in the disclosure of information on the basis of which suit could have been brought.
However, the discovery rule is of no help to appellant. As one commentator has observed,
The O'Keeffe decision should not have a great impact on the "permanent loan" problem. As previously demonstrated, it is well established that a bailee for an indefinite time must take some action inconsistent with the terms of the bailment in order to gain title by adverse possession or to bar return of an art object by the running of the statute of limitations. This action must either be communicated to the bailor or be such that a reasonable person would understand that the bailee is claiming title or otherwise committing an act of conversion. Because the statute of limitations does not start to run on the making of a permanent loan, it makes no difference if the discovery rule is substituted for the doctrine of adverse possession. Quite simply, there is nothing to discover. [Ward, The Georgia Grind: Can the Common Law Accommodate the Problems of Title in the Art World, Observations on a Recent Case, 8 J.C. & U.L. 533, 548 (1982) (footnote omitted).]
In this case, events giving rise to the estate's cause of action did not occur until 1980, when Mrs. McCagg's successors were well aware of their rights and promptly took legal action to enforce them. By contrast, the Museum's theory ignores the fact that the cause of action did not accrue until demand was made. This theory would hold that, by the exercise of reasonable diligence, the executor or legatees should have discovered the existence of the paintings not the accrual of a cause of actionat some earlier time. However, that proposition, if true, would be relevant only on the basis of a premise that we have rejected: that Mrs. McCagg's successors were under a duty to demand return within some limited time. Indeed, if the Museum's theory that the clock should be deemed to have begun running at Mrs. McCagg's death were valid, application of the discovery rule might well defeat its claim.[6]
In sum, we find no persuasive reason for converting an indefinite gratuitous loan into a de facto gift. When demand for delivery was made and refused, legal steps to enforce the right of possession were taken promptly. Neither the original bailor nor her successors were required, at the risk of forfeiting title, to demand the paintings at any earlier time. Accordingly, the trial court's order directing delivery of the paintings to the estate was proper.
Affirmed.
NOTES
[1] The Museum suggests using either the applicable limitations period (3 years), D.C.Code 1981, § 12-301(2), or the longest statutory period for recovery of personal property (10 years), id. § 42-215, as a yardstick for estimating a reasonable time.
[2] Appellee contends that such cases, which generally involve loans or deposits of money or securities, are entirely inapposite. However, we are not prepared to rule that a finite reasonable time standard would under no circumstances be appropriate in the case of a bailment of non-fungible goods. But the factual distinctions do indicate that, in a case like the present one, there is no basis for routinely or presumptively limiting the time for demand to a period equal to the statutory limitations period, as appellant would have us do on the authority of the cited cases.
[3] [T]he time when the demand must be made depends upon the construction to be put upon the contract in each case. If the contract requires a demand without language referring to the time when the demand is to be made, it is as if the words `within a reasonable time' were found in it. What is a reasonable time is ... to be determined with reference to the nature of the contract and the probable intention of the parties as indicated by it. [Campbell v. Whoriskey, supra 170 Mass. at 67, 48 N.E. at 1072.]
[4] Nyhus involved rights under an employment contract, rather than a bailment agreement. However, its observation regarding the timing of demand is also pertinent in the latter context.
[5] Therefore, the possibility that the Museum might not have been able to locate the owners with reasonable efforts does not aid the Museum's cause. However, we note that in all probability the successors could have been contacted with minimal effort. The Museum's records regarding the paintings contain a newspaper clipping giving notice of Mrs. McCagg's death. This death notice contains the names of the executor and all four of McCagg's siblings, who were the residuary legatees. There is no evidence that any attempt was made to contact any of these people, either at the time of death or subsequently. Even without the clipping, the Museum could have learned the identities of the successors by simply consulting the public records of the Register of Wills, which are indexed by the name of the decedent.
[6] The record suggests that neither the legatees nor their successors learned of the accrual of their right to require delivery of the paintings until late 1979. If so, it cannot be contended that they failed to discover their rights at an earlier time due to their own lack of reasonable investigation, since they were apparently unaware that there was anything to search for. This situation thus stands in sharp contrast to O'Keeffe, where the owner was well aware of the existence of the paintings and the fact that they had been stolen, and thus could be expected to take steps to find them. Accordingly, the discovery rule arguably could be invoked to toll the statute of limitations until 1979, and the present suit would still be timely.